UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

_____

Case No. 21-10965-D

_____

GREGORY GAFFNEY,

Appellant,

v.

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS, ET. AL.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

_____

INITIAL BRIEF OF APPELLANT
(Substituted Initial Brief)

_____

Christopher A. Desrochers, Esq.
Christopher A. Desrochers, P.L.
2504 Ave. G NW
Winter Haven, FL 33880
(863) 299-8309/Fax (863) 591-3236
Designated Email: cadlawfirm@hotmail.com

APPOINTED COUNSEL FOR APPELLANT

No. 21-10965-D

Gregory Gaffney v. Secretary, Florida Department of Corrections, et. al.

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and local rules of this Circuit, Christopher A. Desrochers, Esq., Counsel for the Appellant, Gregory Gaffney, hereby submits the following list of persons and entities that counsel believes is interested in the outcome of the proceedings, as well as those persons and entities that are required to be disclosed by rule:

Ricky D. Dixon, Secretary, Florida Department of Corrections.

Gregory Gaffney, Appellant.

"K", the complaining witness at the trial level.

Amanda Raymond, parent of "K".

Ashley Moody, Attorney General, State of Florida.

Allison Leigh Morris, Assistant Attorney General, State of Florida.

G. Kendall Sharp, Senior United States District Judge, Middle District of Florida.

Monique Worrell, State Attorney, Ninth Judicial Circuit, in and for Orange County, Florida.

Christopher A. Desrochers, Esq., counsel for Appellant.

Christopher A. Desrochers, P.L.

One or more Certificates of Interested Persons and Corporate Disclosure Statement have been previously filed by the Appellant in this matter as a separate document on or about May 3, 2021 and July 26, 2023 (Doc. 8; 44) and as part of the Appellant's original Initial Brief (Doc 29, pg. ii), and are supplemented by this certificate.

## STATEMENT REGARDING ORAL ARGUMENT

This is an appeal from a Certificate of Appealability issued by this Court on a single issue:

> Whether the state post-conviction court unreasonably found that Gaffney's counsel was not deficient, and Gaffney was not prejudiced, where counsel failed to introduce potentially exculpatory emails from a significant witness at trial.

> (Doc. 21 at Pg. 1).

While this would seem a fairly straightforward issue, its treatment, so far, has not been quite so straightforward. As will be seen in this brief, it would appear that several courts missed the point that this Court may have found when it issued the certificate. Perhaps the other courts missed the point in more ways than one.

Mr. Gaffney would assert that oral argument would greatly assist this Court in resolving the issue it found when this Court issued the Certificate of Appealability. This case deals with the application of the Florida Evidence Code and Rule 3.850 of the Florida Rules of Criminal Procedure to the Strickland issue addressed in the certificate. Mr. Gaffney would assert that there are certain issues in this case in which state law differs from federal law on similar topics, and oral argument would assist the Court in clarifying those issues, as well as perhaps finally getting to the point that

a few courts have already missed.

<u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS                    C1

STATEMENT REGARDING ORAL ARGUMENT              i

TABLE OF CONTENTS                                              iii

TABLE OF AUTHORITIES                                        iv

STATEMENT OF JURISDICTION                              1

STATEMENT OF THE ISSUE PRESENTED            1

STATEMENT OF THE CASE                                    1

    Course of the Proceedings Below                    1

    Statement of the Facts                                    7

    Incarceration Status                                        15

STANDARD OF REVIEW                                        16

SUMMARY OF ARGUMENT                                    19

ARGUMENT                                                            22

<u>POINT ON APPEAL</u>                                          22

      THE DISTRICT COURT ERRED IN DENYING THE SECOND AMENDED WRIT OF HABEAS CORPUS. THE STATE COURT AND THE DISTRICT COURT UNREASONABLY APPLIED <u>STRICKLAND</u> WHEN

THE FAILURE TO ADMIT EMAILS THAT
DEMONSTRATED BIAS AND MOTIVATION TO LIE
OF UP TO THREE CRITICAL STATE WITNESSES
WAS CLEARLY INEFFECTIVE ASSISTANCE OF
COUNSEL WHICH CLEARLY PREJUDICED THE
OUTCOME OF THE PROCEEDINGS.

CONCLUSION                                                    39

CERTIFICATE OF COMPLIANCE                                    41

CERTIFICATE OF SERVICE                                       41

## TABLE OF AUTHORITIES

<u>CASES</u>

<u>Baucham v. State</u>, 881 So. 2d 96-97 (Fla. 1st DCA 2004).        24

<u>Chandler v. United States</u>, 218 F.3d 1305(11th Cir. 2000).        36,37

<u>Davis v. Alaska</u>, 415 U.S. 308, 94 S.Ct. 1105,

39 L.Ed.2d 347 (1974).        24

<u>Davis v. State</u>, 527 So. 2d 962, 963 (Fla. 5th DCA 1988).        25

<u>Flores v. Miami-Dade County</u>, 787 So. 2d 955

(Fla. 3d DCA 2001).        24,27

<u>Gelabert v. State</u>, 407 So. 2d 1007 (Fla. 5th DCA 1981).        25

<u>Green v. State</u>, 691 So. 2d 49, 50 (Fla. 4th DCA 1997).        25

<u>Harrington v. Richter</u>, 562 U.S. 86, 131 S.Ct. 770,

178 L.Ed.2d 624 (2011).        16, 17, 18,35

<u>Jacobs v. State</u>, 880 So. 2d 548 (Fla. 2004).        31

<u>Jones v. State</u>, 678 So. 2d 890, 893 (Fla. 4th DCA 1996).        25,27

<u>Livingston v. State</u>, 678 So. 2d 895 (Fla. 4th DCA 1996).        25

<u>McKiver v. Secretary, Fla. Dept. of Corrections</u>,

991 F.3d 1357 (11th Cir. 2021).        16,35

<u>Musson v. State</u>, 242 So. 3d 512 (Fla. 2d DCA 2018).        36,37

v

Olden v. Kentucky, 488 U.S. 227, 109 S.Ct. 480,

102 L.Ed.2d. 513 (1988) .                                    24

Smith v. State, 679 So. 2d 30 (Fla. 4th DCA 1996).          25

State v. Torres, 304 So. 3d 781 (Fla. 4th DCA 2020).        29

U.S. v. Abel, 469 U.S. 45, 105 S.Ct. 465,

83 L.Ed.2d 450 (1984).                                       25

STATUTES

28 **U.S.C.** sec. 2254(d)(1)-(2).                           16,35

AUTHORITIES

Charles W. Ehrhardt, **Florida Evidence**

sec. 608.5 at pg. 698 (2023 ed.).                            24,27

<u>STATEMENT OF JURISDICTION</u>

This is an appeal from a denial of a federal habeas petition brought under Section 2254 of 28 United States Code.  This Court has jurisdiction pursuant to Section 2253(c) of 28 United States Code, based upon the Certificate of Appealability issued by this Court.  (Doc. 21 at Pg. 1).

<u>STATEMENT OF THE ISSUE PRESENTED</u>

The Statement of the Issue Presented is taken directly from the Certificate of Appealability issued by this Court:

Whether the state post-conviction court unreasonably found that Gaffney's counsel was not deficient, and Gaffney was not prejudiced, where counsel failed to introduce potentially exculpatory emails from a significant witness at trial.

(Doc. 21 at Pg. 1).

<u>STATEMENT OF THE CASE</u>

<u>Course of Proceedings Below</u>

On or about April 1, 2010, the State of Florida charged the Appellant, Mr. Gregory Gaffney, with four counts of Lewd or Lascivious Molestation, a violation of Section 800.04(5)(b) of the Florida Statutes.  (Doc. 32 at Pg. 154-56).  The case went to trial on or about January 14, 2011, where Mr. Gaffney was found guilty as charged

1

of two counts of Lewd or Lascivious Molestation, both regarding a complaining witness named "K". (Doc. 32 at Pg. 158-59). The remaining two counts were dismissed by the trial court through a motion for judgment of acquittal during trial. (Doc. 32 at Pg. 500). Mr. Gaffney was sentenced to two concurrent terms of natural life. (Doc 32 at Pg. 161-62).

Mr. Gaffney took a direct appeal as of right with the Florida Fifth District Court of Appeal. (App. 5 at Pg. 1). However, it appears from the Fifth District docket and resulting order, that the appeal was dismissed, based on a notice of voluntary dismissal. (App 5 at Pg. 3-4). Mr. Gaffney filed a motion for postconviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, which included a claim for failing to use two emails in question as impeachment material. (Doc. 32 at Pg. 653). The two emails were sent from the same email address, which bears the listed name of "A.R." Both are written in all-caps shouty language, and read as follows:

I JUST WANT TO GIVE YOU A HEADS UP THAT [C] HAS BEEN TOUCHED IN HER PANTS AND THERE IS AN INVESTIGATION GOING ON. IKNOW [sic] YOU HAVENT [sic] BEEN HERE BUT ONE DAY IN THREE WEEKS, BUT WE HAD TO GIVE THE DETECTIVES YOUR NAME. WHAT I HOPE AND PRAY IS THAT

2

ITS [sic] NOT [M].

(Doc. 32 at Pg. 144)

EVEN THOUGH THE BABY GIRL SAID YOU DIDNT [sic] TOUCH HER AND SHE DIDNT [sic] KNOW WHO IT IS, YOU SHOULDN'T HAVE EVER MENTIONED I TALKED TO YOU.  DETECTIVE DILLAN WOULD REALLY FREAK IF HE KNEW THAT THE TWINS STAY CLINGED TO YOU THE WHLOE [sic] TIME YOUR [sic] AROUND.  THEY REALLY LOVE YOU GREG, AND YOU CAN TELL THAT THEY TRUST YOU COMPLETELY AND ADORE YOU, BUT DON'T THINK FOR A MINUTE I WOULDNT [sic] LIE ON YOU TO KEEP MY CHILDREN.  ALWAYS KEEP THAT IN MIND.

(Doc. 32 at Pg. 145).

Interestingly enough, in the amended motion for postconviction relief, Mr. Gaffney alleged that at least one of the possible uses for the emails was to establish bias and motivation to lie on the part of its author, A.R.  (Doc. 32 at Pg. 667).

The trial court summarily denied relief on this ground.  (Doc. 32 at Pg. 680, 707, 712).  In its order of March 24, 2015, the trial court focused on four reasons in determining that Mr. Gaffney was not entitled to relief as a matter of law.  The first was that the emails did not constitute impeachment evidence, as they did not contain inconsistent statements.  (Doc. 32 at Pg. 706-07).  Second, the trial court stated that

3

the emails offered are not authenticated emails from Yahoo.com. (Doc. 32 at Pg. 707). Further, and without holding an evidentiary hearing, the trial court found that there was "no evidence that the emails could be authenticated in order to introduce them into evidence to prove the statements were made". (Doc. 32 at Pg. 707). Third, the trial court expressed doubts as to whether A.R. actually authored the first email because the child's name was misspelled. (Doc. 32 at Pg. 706). Without conducting an evidentiary hearing on the subject, the trial court simply found "It is highly unlikely a mother would incorrectly spell her own child's name."

Finally, the trial court found that, during the trial, Mr. Gaffney declined to present any evidence in his case in his own defense. (Doc 32 at Pg. 707). This was based on a colloquy used to determine whether a defendant is knowingly waiving his right to testify and instead remain silent, and the pertinent part of that colloquy is as follows:

> The Court: Is there any evidence, whatsoever, that you believe exists or that you know exists or any witnesses that you can point to that you would like to present in defense of these charges?
>
> The Defendant: Not without taking the stand, your Honor, but besides that, no.
>
> (Doc. 32 at Pg. 507).

4

The trial court did mention in its summary denial order that Mr. Gaffney did propose using at least one of the emails to establish that A.R. "had a motive to lie" and would help show "she would lie on Defendant to protect her son from prosecution". (Doc. 32 at Pg. 705, 706). However, the trial court's order does not address the use of the emails as impeachment evidence to help establish bias or motivation to lie.

Mr. Gaffney took an appeal of the trial court's decision. (App. 6 at Pg. 1). The appellate court affirmed on the count involving the use of the emails for impeachment purposes, and remanded for an evidentiary hearing on other issues. (App. 6 at Pg. 3-5). The final appeal after the evidentiary hearing resulted in a "per curiam affirmed" opinion. (App. 7, at Pg. 4).

Mr. Gaffney filed a successive 3.850 motion on grounds not relevant to the issue on appeal. (App. 4 at Pg. 1). This was denied by the trial court on or about July 27, 2017. (App. 4 at Pg. 3-4). Mr. Gaffney appealed this, and the appellate court issued a per curiam affirmed opinion on or about November 7, 2017. (App. 8, at Pg. 2).

With his state court remedies exhausted, Mr. Gaffney turned to the United States District Court. On or about October 16, 2019, Mr. Gaffney filed a Second Amended Petition for Writ of Habeas Corpus. (Doc. 32 at Pg. 10). In that petition,

5

Mr. Gaffney argued, in Ground Nine, ineffective assistance of counsel for failing to impeach A.M. with the emails based on bias and motivation to lie. (Doc. 32 at Pg. 25, 27). Indeed, while Mr. Gaffney makes some collateral references about A.M.'s in-court testimony, it appears the main thrust of the argument in Ground Nine is bias and motivation to lie, and not anything else, such as impeachment for a prior inconsistent statement.

The United States District Court denied habeas corpus relief. (Doc 32 at Pg. 98). Relevant to the issue on appeal, the District Court found the following:

> As to the e-mails, the Court agrees with the trial court's finding:
>
>> The substance of the emails would not have been admissible as extrinsic evidence if [AR] denied making the statements. The emails are not part of a business record certified by yahoo.com. Therefore, if [AR] denied sending the emails, there is no evidence that the emails could be authenticated in order to introduce them into evidence to prove the statements were made.
>
> The Court also notes that the use of the e-mails could not have been used to impeach a prior inconsistent statement because [AR] did not testify that she did not suspect another individual of the molestation.

(Doc. 32 at Pg. 96).

The District Court also denied a certificate of appealability. (Doc. 32 at Pg. 97-98).

This Court, however, did grant a certificate of appealability as to the limited issue which is the subject of this brief. (Doc. 21 at Pg. 1).

Statement of the Facts

For the purposes of this appeal, AM, who is also known as AR, will be referred to as "AM/AR"

AM/AR and her seven children, of which the complaining witness, K, was one, lived together in a three bedroom, two bath home, along with a stepbrother, a niece, a nephew, and person named "Uncle Dave", who is not her real uncle. (Doc. 32 at Pg. 209, 210, 214, 215, 215, 216). Accommodations were a little tight, with folks frequently doubling up in rooms and folks sometimes having to sleep on the floor. (Doc. 32 at Pg. 218, 219).

K testified that "Uncle Greg" (who is also not her uncle, but a mutual friend of the grownups who reside at the home) would frequently stop by the home; often around dinner. (Doc. 32 at Pg. 219, 220). K stated that Greg would come into her room "a lot" at night. (Doc. 32 at Pg. 221). This was done while other folks were staying in her room as well. (Doc. 32 at Pg. 221).

K stated that, when Greg showed up in the room, she would "fake sleep", but

7

K could not explain why she would do that. (Doc. 32 at Pg. 221, 222). K testified that when Greg came into the room, Greg would touch her "private parts", but did not know whether the touching was over or under her clothing. (Doc. 32 at Pg. 222). K stated afterwards that, when she woke up, "something" "was bruised and it was red", which K later identified as her vagina. (Doc. 32 at Pg. 222, 223).

According to K, Greg would lay beside her on the bed, together with others who were also on the same king-sized bed. (Doc. 32 at Pg. 224-25). AM/AR would later testify that five people were sleeping in that room at the time of the incident. (Doc. 32 at Pg. 307). K stated Greg pulled K up to him from behind in a spooning position. (Doc. 32 at Pg. 225). According to K, Greg would then tell K to rub his stomach. (Doc. 32 at Pg. 226). On one occasion K testified that Greg made her grab his "wiener", which she did. (Doc. 32 at Pg. 226-27). When K tried to stop, Greg prevented it, and told her to squeeze it. (Doc. 32 at Pg. 228, 229).

K also testified that one time, Greg touched her vagina. (Doc. 32 at Pg. 229). According to K, this happened the week before the "wiener" touching incident. (Doc. 32 at Pg. 229). K later testified that Greg touched her vagina twice. (Doc. 32 at Pg. 230). K stated after it happened the first time, she did not tell her mother, but instead told her brother, who then told her mother. (Doc. 32 at Pg. 231). K stated she did not tell her mother because she "was scared to". (Doc. 32 at Pg. 231).

8

Eventually, K stated she disclosed to her mother, and went somewhere for an interview. (Doc. 32 at Pg. 232). Before the interview, K stated she saw Greg, who told her he didn't do it. (Doc. 32 at Pg. 232). However, K testified she knew Greg did it because she saw his face. (Doc. 32 at Pg. 232).

When asked to identify if "Greg" was in the courtroom, K could not identify anyone in the courtroom who was "Greg". (Doc. 32 at Pg. 237). When K could not identify Mr. Gaffney as "Greg", the State asked her how long it had been since she had seen "Greg". (Doc. 32 at Pg. 237). K stated that she did not know. (Doc. 32 at Pg. 237).

On cross-examination, K admitted that she told the CPT interviewer that she did not see who had touched her. (Doc. 32 at Pg. 243). K then admitted she lied to the interviewer. (Doc. 32 at Pg. 244). Her reasoning for lying went as follows:

> I really don't know. I just was scared. Sometimes I'm scared to tell the truth, but sometimes I'm not.

> (Doc. 32 at Pg. 244).

On redirect, K explained that she lied to the interviewer because Greg told her that he didn't do it. (Doc. 32 at Pg. 246). K admitted she lied even though she had seen Greg's face and knew Greg did it. (Doc. 32 at Pg. 246-47). K then offered a new reason for lying:

. . . I only lie when people want me to lie.

(Doc. 32 at Pg. 247).

K also reiterated that Greg did it and that she did not state to anyone that anyone else had improperly touched her.  (Doc. 32 at Pg. 248).

B, a sister of K, was asked if she remembered "when something bad happened to her sister K".  (Doc. 32 at Pg. 258).  B's response was "No".  (Doc. 32 at Pg. 258). B testified that Greg touched her "private part" "between [her] legs", and that she touched Greg's "private part".  (Doc. 32 at Pg. 263, 264).  However, B also testified that the basis for her testimony was a video that B watched prior to testifying of an interview between B and someone she thought was the prosecutor.  (Doc. 32 at Pg. 263, 264, 265).  B testified that she presently had on independent recollection of Greg, no independent recollection of Greg touching her, and that she did not know whether or not she was telling the truth during the video interview.  (Doc. 32 at Pg. 265, 267).

AM/AR, the mother of K, testified that, on August 10, 2009, K had been crying all night, and AM/AR went to her room around 5:00 AM.  (Doc. 32 at Pg. 289). K complained that her "private part was red and had stuff leaking, and it hurt".  (Doc. 32 at Pg. 276, 288).  AM/AR observed that her "vagina was red and just swollen" and a green or yellow discharge was coming from it.  (Doc. 32 at Pg. 290, 291).

10

AM/AR testified she took K to AM's bedroom to talk. (Doc. 32 at Pg. 294). When AM/AR made inquiries, K stated that someone had touched her in the middle of the night. (Doc. 32 at Pg. 291). Eventually, K told AM/AR that "Uncle Greg" (whom AM/AR knew as Mr. Gaffney) had touched K. (Doc. 32 at Pg. 291). AM/AR stated that K did not identify anyone else other than Uncle Greg as the perpetrator, and also stated about being touched by Uncle Greg a prior time. (Doc. 32 at Pg. 292-93). AM/AR confirmed that K told her brother about the incident first. (Doc. 32 at Pg. 313). However, K told AM/AR "that Mr. Gaffney got on top of her and put something in her pee pee". (Doc. 32 at Pg. 314). According to AM/AR, K also related that, in a prior instance, Greg put something in her vagina and told her not to scream. (Doc. 32 at Pg. 293).

After informing law enforcement, AM/AR stated they were instructed not to tell Mr. Gaffney that anything was going on, and to make sure Mr. Gaffney was not there at night. (Doc. 32 at Pg. 299). That became increasingly difficult, as Mr. Gaffney kept showing up all the time, and the excuse machine began showing signs of overuse. (Doc. 32 at Pg. 299). AM/AR gathered that, somehow, Mr. Gaffney found out about what was going on, and managed to speak with several persons in the house about it on the day of the CPT interview. (Doc. 32 at Pg. 299).

AM/AR stated that, after the CPT interview, Mr. Gaffney confronted several

11

of the adults living at the home, including AM/AR.  (Doc. 32 at Pg. 302).  Mr. Gaffney was aware of the allegations and denied them.  (Doc. 32 at Pg. 303).

On cross-examination, AM/AR admitted that, on the night prior to the disclosure by K, AM/AR never saw Mr. Gaffney there, and did not see him there in the morning.  (Doc. 32 at Pg. 311).  Further, AM/AR testified that the family kept the front door locked at night, and AM/AR did not hear Mr. Gaffney come into the house or walk about the house during the night.  (Doc. 32 at Pg. 310, 311).  AM/AR stated Mr. Gaffney did not have a key and she had no personal knowledge that Mr. Gaffney was there that night.  (Doc. 32 at Pg. 312).  AM/AR also stated there were no signs of forced entry.  (Doc. 32 at Pg. 313).  Yet AM/AR persisted in her belief that, somehow, Mr. Gaffney managed to get into the house after AM/AR retired for the night at 11:00 PM.  (Doc. 32 at Pg. 313).  This is true despite her testimony that AM/AR did not suspect anyone had entered the home during the night.  (Doc. 32 at Pg. 315-16).  AM/AR was also adamant that she did not and would not allow a grownup to share a bed with children, and never saw Mr. Gaffney do same.  (Doc. 32 at Pg. 311, 312)

M, a brother of K, testified that Mr. Gaffney would sleep over at the house about twice a week.  (Doc. 32 at Pg. 330).  M would know this would happen, because M would find Mr. Gaffney either on the couch, Uncle Dave's bed or on the

childrens' bed. (Doc. 32 at Pg. 331). However, M did admit that finding Mr. Gaffney in the childrens' room was a rare occurrence. (Doc. 32 at Pg. 331).

M also testified that he saw Mr. Gaffney in the childrens' room on the night of the incident, sleeping next to K. (Doc. 32 at Pg. 332, 337). Upon seeing Mr. Gaffney in the bed, M said he just went back to sleep, as it was not of concern to him. (Doc. 32 at Pg. 733, 734). M also testified that he heard a truck in the night, and thought he saw Mr. Gaffney enter the home. (Doc. 32 at Pg. 337).

The next morning, M stated that Mr. Gaffney was no longer in the bedroom. (Doc. 32 at Pg. 333). However, K was awake and told M that she felt air in her diaper. (Doc. 32 at Pg. 334, 339, 340). According to M, K had "bad hair" and one of the straps of her diaper was not fastened. (Doc. 32 at Pg. 332).

M also testified that Mr. Gaffney was doing laundry that day. (Doc. 32 at Pg. 335). In particular, Mr. Gaffney, who never normally washed the sheets, was laundering one of the sheets from the childrens' bedroom. (Doc. 32 at Pg. 335, 336, 337). M stated he saw a stain on the sheet that looked "like a little pee spot, but it wasn't pee". (Doc. 32 at Pg. 336).

During the trial, the State entered a taped interview with Mr. Gaffney. (Doc. 32 at Pg. 388). In the interview, Mr. Gaffney largely made exculpatory statements. Mr. Gaffney denied touching K, denied any coaching, and adamantly denied washing

13

the sheets. (Doc. 32 at Pg. 391-94). Detective Christopher Dillon testified that, during the course of his investigation, he learned that, while Mr. Gaffney was free to enter the home in question, he did not possess a key. (Doc. 32 at Pg. 403).

In the CPT interview, K stated that she did not know who touched her, and only surmised it was "Uncle Greg" because he would often sleep in that room. (Doc. 32 at Pg. 483). At one point, when the CPT interviewer began asking leading questions implicating "Uncle Greg", K corrected the CPT interviewer at least twice by stating she wasn't sure who did it. (Doc. 32 at Pg. 484, 488).

After putting on the CPT interview, the State rested its case in chief. (Doc. 32 at Pg. 509). The trial court also took a recess and inquired of Mr. Gaffney whether he wished to testify in his own defense. (Doc. 32 at Pg. 507). During the colloquy, the trial court asked the following:

> The Court: Is there any evidence, whatsoever, that you believe exists or that you know exists or any witnesses that you can point to that you would like to present in defense of these charges?
>
> The Defendant: Not without taking the stand, your Honor, but besides that, no.
>
> (Doc. 32 at Pg. 507).

The defense rested its case without putting on any additional witnesses or evidence.

14

(Doc. 32 at Pg. 518).

Incarceration Status:

Mr. Gaffney is presently incarcerated.

STANDARD OF REVIEW

This case has a layered standard of review. The overall denial of Mr. Gaffney's Section 2254 petition is subject to *de novo* review. See McKiver v. Secretary, Fla. Dept. of Corrections, 991 F.3d 1357, 1363 (11th Cir. 2021). However,

> Mixed questions of law and fact are also reviewed *de novo*, but the district court's factual findings are reviewed for clear error. Whether a claim is procedurally defaulted is a mixed question of law and fact and is therefore reviewed *de novo*.
>
> Id. (citations omitted).

Review of the state court decision is performed pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which is codified, in substantial part, as Section 2254(d)(1)-(2) of 28 United States Code. See id.; Harrington v. Richter, 562 U.S. 86, 97-98, 131 S.Ct. 770, 783-84, 178 L.Ed.2d 624 (2011). Under AEDPA, this Court can only grant relief if either 1) the state court unreasonably applied governing law as established by the United States Supreme Court; or 2) correctly identifies the law, but applies the law to the facts in "an objectively unreasonable manner"; or 3) the decision was based on "an unreasonable determination of the facts in the light of the evidence presented in the State court proceeding". See 28 **U.S.C.** sec. 2254(d)(1)-(2); McKiver, 991 F.3d at 1364.

In applying AEDPA to <u>Strickland</u> claims, "The pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable." <u>See</u> <u>Harrington</u>, 562 U.S. at 101, 131 S.Ct. at 785, 178 L.Ed.2d 624. Further,

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

> <u>Id.</u>, 562 U.S. at 103, 131 S.Ct. at 786-87, 178 L.Ed.2d 624.

> When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

> <u>Id.</u>, 562 U.S. at 105, 131 S.Ct. at 788, 178 L.Ed.2d 624.

> If this standard is difficult to meet, that is because it was meant to be. . . . [AEDPA] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a

17

substitute for ordinary error correction through appeal.

<u>Id.</u>, 562 U.S. at 102, 131 S.Ct. at 786, 178 L.Ed.2d 624. (citations and subquotes omitted).

## SUMMARY OF ARGUMENT

In this case, the District Court erred in denying the petition for writ of habeas corpus, as both the District Court and the state court unreasonably applied Strickland to the facts of this case. In particular, both the state court and the District Court completely ignored Mr. Gaffney's bias/motivation to lie argument regarding the two emails. The two emails in question contain at least substantial, if not devastating, evidence that at least one critical witness, AM/AR, was willing to lie on Mr. Gaffney directly to protect her children and indirectly to preserve her parent-child relationship with both M and K. The emails also disclose that AM/AR had her suspicions (and one could infer was aware from the past), that M, K's half brother, was molesting K.

These emails provide substantial evidence that M, K, and AM/AR had a bias and motivation to lie against Mr. Gaffney and in favor of preserving their own family relationships, ever how perverted they may be. This was augmented by testimony by K that she "only lie[s] when people want [her] to lie" (Doc. 32 at Pg. 247). A defense that K, M, and AM/AR had implicated Mr. Gaffney to save their family relationship and allow AM/AR to avoid juvenile dependency proceedings is not farfetched, especially when the two emails come into consideration.

Such bias/motivation to lie evidence was substantial in Mr. Gaffney's defense, and it was unreasonable for both the state court and the District Court to dismiss the

bias/motivation to lie issue out of hand and without really addressing it and without having an evidentiary hearing on the issue.  It is very clear that trial counsel was deficient for not addressing it in some way, and for at least not trying to bring the emails in somehow at trial.  While the courts mentioned that these emails could somehow never be authenticated, that is an exercise in sheer speculation.  It also flies in the face of the experience of this Court, who has seen countless emails get authenticated (when they had to be) in child pornography and similar prosecutions. If there was some kind of an authentication issue, that really points more towards counsel's ineffectiveness for failing to accomplish this task, as opposed to some ground to deny Mr. Gaffney's motions outright and without a hearing.

On the contrary, competent counsel would have had little problem both authenticating these emails and then having them admitted as evidence of bias and motivation to lie.  All things considered, neither the state court nor the District Court pointed to some clever trial strategy or other reason why the emails would have been harmful to Mr. Gaffney's defense.  In all likelihood, the jury would have been able to consider the emails, as failure to admit bias/motivation to lie evidence, when relevant, is generally considered reversible error.   Here, the credibility of K, M, and AM/AR were all crucial, given the lack of forensic or incriminating statements in this case.

For these reasons, both the state courts and the District Court unreasonably applied Strickland to the facts of this case. For this reason, this Court should grant relief on the condition of either a new trial or an evidentiary hearing to address the Strickland issue in state court.

<u>ARGUMENT</u>

<u>POINT ON APPEAL</u>

> THE DISTRICT COURT ERRED IN DENYING THE
> SECOND AMENDED WRIT OF HABEAS CORPUS.
> THE STATE COURT AND THE DISTRICT COURT
> UNREASONABLY APPLIED <u>STRICKLAND</u> WHEN
> THE FAILURE TO ADMIT EMAILS THAT
> DEMONSTRATED BIAS AND MOTIVATION TO LIE
> OF UP TO THREE CRITICAL STATE WITNESSES
> WAS CLEARLY INEFFECTIVE ASSISTANCE OF
> COUNSEL WHICH CLEARLY PREJUDICED THE
> OUTCOME OF THE PROCEEDINGS.

This case centers around two emails, both purportedly issued by AM/AR (apparently when she was known as "AR"). (Doc. 32 at Pg. 144-145). While these emails are not models of grammatical clarity and syntax, they certainly get the point across:

> DON'T THINK FOR A MINUTE I WOULDNT [sic] LIE ON YOU TO
> KEEP MY CHILDREN. ALWAYS KEEP THAT IN MIND.
> (Doc. 32 at Pg. 145) (emphasis theirs).

22

The emails also disclose that AM/AR hopes that the culprit is not M, one of K's half siblings.  (Doc. 32 at Pg. 144).

From an objective standpoint, the two emails, read *in pari materia*, disclose that AM/AR likes Mr. Gaffney, but loves her children; but perhaps more to the point loves raising her own children in her home.  It is very clear that, if, in her mind, if it ever came between implicating Mr. Gaffney and keeping her children, Mr. Gaffney had better be prepared to be thrown under a very large bus.

What also comes out is that AM/AR suspected M, one of K's half-siblings, might have been the midnight molester.  (Doc. 32 at Pg. 144).  This type of incest is not something that normally springs up in a parent's mind unless AM/AR has had some prior experience with this issue with M.  If that is true, then AM/AR certainly had something to worry about if she knew that M had prior tendencies to molest his half-sisters and AM/AR, as their parent, took no steps to protect.  Indeed, all of the testimony at trial (including testimony from M himself) was that M slept in the same room with the female half-siblings.  Failure to protect is an excellent and time-honored ground for juvenile dependency and an excellent way for a mom or a dad to have the State start raising their children for them, perhaps permanently.

As a result, if what is contained in the two emails was even halfway suspected by AM/AR to be correct, it would provide a huge incentive for AM/AR to devise an

alternate set of facts that, while plausible, would also be both objectively unverifiable and easy for small children to remember. Saying Mr. Gaffney did it, and then coaching her children to repeat an easy scenario, would certainly foot the bill.

Evidence that tends to prove bias or motivation to lie is a peculiar species of impeachment evidence. It possesses constitutional overtones, and the Sixth Amendment right of confrontation will allow various types of impeachment evidence to come in, even when it is otherwise barred by state law. See Olden v. Kentucky, 488 U.S. 227, 232,109 S.Ct. 480, 102 L.Ed.2d. 513 (1988) (barring impeachment evidence that indicated complaining witness might have labeled consensual sex rape to cover an interracial love affair violated Confrontation Clause); Davis v. Alaska, 415 U.S. 308, 320 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (finding state law barring use of juvenile adjudications to impeach witness for bias violated Confrontation Clause).

"Evidence that is inadmissible as impeachment under other methods is admissible if it show the bias of a witness" Charles W. Ehrhardt, **Florida Evidence** sec. 608.5 at pg. 698 (2023 ed.); Flores v. Miami-Dade County, 787 So. 2d 955, 958 (Fla. 3d DCA 2001) (citing Ehrhardt). If a witness denies bias or motivation to lie, then both extrinsic and collateral evidence may be used to impeach that witness by contradiction. See Baucham v. State, 881 So. 2d 96-97 (Fla. 1st DCA 2004);

24

Gelabert v. State, 407 So. 2d 1007, 1010 (Fla. 5th DCA 1981).  Unlike other types of evidence, evidence of bias/motivation to lie does not require that a foundation be laid, and extrinsic evidence of bias/motivation to lie may be introduced without ever having made inquiries of the person to whom the evidence is directed.  See U.S. v. Abel, 469 U.S. 45, 52, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984); Jones v. State, 678 So. 2d 890, 893 (Fla. 4th DCA 1996).

Further, under Florida law, "Utterances of a witness indicating motive or bias do not constitute hearsay when offered for impeachment purposes."  Green v. State, 691 So. 2d 49, 50 (Fla. 4th DCA 1997). "Because liberty is at risk in a criminal case, a defendant is afforded wide latitude to develop the motive behind a witness' testimony."  Livingston v. State, 678 So. 2d 895, 897 (Fla. 4th DCA 1996).

While the failure to admit bias/motivation to lie evidence is subject to harmless error analysis, harmful error is normally found when the evidence "went to possible motive the witnesses may have to exaggerate or even completely fabricate their testimony" or when the credibility of a witness is "critically important" to a case.  See Smith v. State, 679 So. 2d 30, 31 (Fla. 4th DCA 1996); Davis v. State, 527 So. 2d 962, 963 (Fla. 5th DCA 1988).  Further, when a case potentially stands or falls based on the credibility of the eyewitnesses to the event, exclusion of bias evidence against those eyewitnesses cannot be harmless error.  See Jones v. State, 678 So. 2d 890, 893

(Fla. 4th DCA 1996).

In this case, the emails plainly relate that AM/AR, the mother of K and M, was absolutely willing to lie on Mr. Gaffney if that is what it took to keep the family together and to have her, and not the State, raise her children. For AM/AR to even think M might have molested his own half-sister tells volumes of a mother who knew something very dark was going on in that house and did not want it to interfere with her maintaining custody of her own children. Under those circumstances, it is not farfetched that mom would be willing to say Mr. Gaffney did it, and then convince her children (including the possible perpetrator, M), to go along with a story that implicated Mr. Gaffney while exonerating both M and the mother.

The complaining witness in this case, K, waffled a lot on her testimony and contradicted her CPT interview, where she claimed she did not know who molested her. (Doc. 32 at Pg. 243). K's admission on the stand that she "only lie[s] when people want [her] to lie" brought both K's credibility and AM's motivation to lie to the forefront of the trial. (Doc. 32 at Pg. 247). If AM/AR had a motivation to lie, and convinced K to do likewise, that would certainly provide K the motivation to lie under K's own, self-styled ethics rules.

Given the absence of significant forensic evidence or incriminating statements made by Mr. Gaffney, the jury was essentially left with the testimony of AM/AR, K,

and M. Whether or not the jury believed these three would have definitely swung the verdict in one direction or another. As a result, this case largely "stood or fell on the jury's assessment of the eyewitness' credibility". <u>See</u> <u>Jones v. State</u>, 678 So. 2d 890, 893 (Fla. 4th DCA 1996). As a result, if the bias evidence had been properly introduced at trial and refused admission by the trial court, reversible error would have almost certainly occurred. <u>See</u> <u>id</u>. Given how harmful this error was, it is difficult to see how allowing trial counsel a pass under <u>Strickland</u> was somehow a reasonable application of <u>Strickland</u> under the circumstances.

In this case, and reviewing the state court evaluation under <u>Strickland</u>, the state court gave four reasons why failing to introduce these emails at trial did not constitute ineffective assistance of counsel. (Doc. 32 at Pg. 706-07). These arguments will be addressed separately.

Reason 1: The emails did not contain impeachment evidence, as they did not contain prior inconsistent statements. (Doc. 32 at Pg. 706-07).

As previously stated, just because the emails could perhaps not be entered as a prior inconsistent statement has nothing to do with whether they could potentially be admitted as evidence of bias or motivation to lie. <u>See</u> <u>Charles W. Ehrhardt</u>, **Florida Evidence** sec. 608.5 at pg. 698 (2023 ed.); <u>Flores v. Miami-Dade County</u>, 787 So. 2d 955, 958 (Fla. 3d DCA 2001) (citing <u>Ehrhardt</u>). Indeed, it is plain that

27

these emails could be entered as bias/motivation to lie evidence against not only AM/AR, but K and M as well.  If mom really did plot with K and M to implicate Mr. Gaffney and shield M, then this evidence impairs the credibility of virtually every witness in the state's case-in-chief who offered allegedly firsthand testimony about the molestation.  Even if AM/AR didn't plot with K and M, but rather K and M plotted to keep M out of trouble and keep mom from picking up a juvenile dependency case for failure to protect, then the emails are still probative of the bias levels of at least K and M, and probably AM/AR for going along with it.

The AEDPA standard is admittedly very high.  However, it would seem that no reasonable jurist would conclude that counsel was employing some clever trial strategy by suppressing the emails simply because the emails did not contain prior inconsistent statements.  They obviously contained evidence of bias and motivation to lie, which was critical evidence in a case where the witness credibility of K, M, and AM/AR were all crucial matters for the jury to consider.

Reason 2: There was "no evidence that the emails could be authenticated in order to introduce them into evidence to prove the statements were made".  (Doc. 32 at Pg. 707).

This sounds interesting, until it is understood no evidentiary hearing was held on this matter.  The State court engaged in sheer speculation when it concluded there

was no way the emails could ever be authenticated.  Indeed, short of an evidentiary

hearing, there would be no real way to explore the issue.

Further, the conclusion that there is no way to authenticate an email as a matter

of law flies in the face of what this Court and every court knows: emails get

authenticated every day.  Emails, just like letters, can be authenticated using

circumstantial evidence, which can include an analysis of the contents of the message

itself.  See State v. Torres, 304 So. 3d 781, 783 (Fla. 4th DCA 2020).  There is also

nothing in the record or otherwise that would indicate Yahoo.com would not respond

to an investigative subpoena, or that it would not turn over all its records about the

email and the account that produced it.  This Court is not a *tabula rasa*, and knows

full well that emails can and do get authenticated when competent trial counsels take

the steps to make it happen.

While the standard is high, Mr. Gaffney would assert that no reasonable jurist

would conclude that no Strickland error occurred because there was allegedly no

possible way to authenticate the emails at issue.  Common sense and court experience

tell all of us these emails are quite capable of authentication.  The fact there is nothing

in the record authenticating or investigating these records is not a reason to find trial

counsel's performance effective.  If anything, it is grounds to find trial counsel

ineffective.  Had trial counsel attempted to introduce these emails without the proper

authentication, trial counsel would have been vulnerable to AM/AR simply denying authorship.  This could be reasonably expected, since someone (according to Mr. Gaffney's theory of defense) who is willing to lie about who molested her child is likely willing to lie about the authorship of an email that essentially states she is willing to lie on Mr. Gaffney to keep her family together.

Reason 3: a spelling error in K's name.  (Doc. 32 at Pg. 706).

The State court made much over the fact that K's name was misspelled in one of the emails, and that "It is highly unlikely a mother would incorrectly spell her own child's name".  (Doc. 32 at Pg. 706).  It would seem this reasoning was made to bolster the need for authentication.

However, since no evidence was taken, and the record provides no evidence about the circumstances under which the email was composed, the source of the typographical error, and the State Court's assignment to an inauthentic author, is sheer speculation.  For all we know, this email was composed on a phone with an autocorrect feature.  (This might, by the way, explain the all-caps "shouty" language and all the other spelling and grammatical errors contained in the emails.)  Given K's real name, an autocorrect feature might easily autocorrect "K" to read "C", thinking someone misspelled the word.  Further, there is no evidence that someone hijacked or misappropriated the email address.

At the stage of the case where Mr. Gaffney was summarily denied, Mr. Gaffney was not required to prove that 1) AM/AR would refuse to authenticate the emails herself; 2) that the State would not concede admission of the emails without proving authentication; 3) that authentication efforts would work; 4) that authentication efforts would identify the specific author; 5) that other evidence brought by the State in rebuttal would not call into question authorship; and 6) that authentication efforts would not also reveal a harmless reason for the name typo. Rather, all Mr. Gaffney had to establish was that his claim was facially sufficient and could not be conclusively refuted by the existing record. See Jacobs v. State, 880 So. 2d 548, 551 (Fla. 2004).

Reason 4: Mr. Gaffney declined to put on a defense. (Doc. 32 at Pg. 707).

The State court also reasoned that, because Mr. Gaffney, in his colloquy about testifying, mentioned he did not want to present any evidence, that this foreclosed his ability argue the emails in his 3.850 motion. (Doc. 32 at Pg. 707).

This argument fails for two very obvious reasons. The colloquy in this case was designed to make sure that Mr. Gaffney was aware of his rights, and that, specifically, he was aware he had a right to testify but was choosing not to do so. (Doc. 32 at Pg. 507). This was not an in-depth examination of his case and whether he did or did not want to present certain things to the jury. The emails were not

31

specified in the colloquy, and there is nothing in the colloquy (unlike the right to testify) that made it clear that he was freely, voluntarily, and intelligently waiving his right to present the emails as impeachment evidence.  (Doc. 32 at Pg. 507).

Indeed, there is no proof that Mr. Gaffney had even been made aware at the time that the emails, as bias/motivation to lie evidence, could be entered as independent, extrinsic evidence in a defense case.  As previously stated, bias/motivation to lie evidence is very different from other impeachment evidence. As a layperson, we cannot assume Mr. Gaffney simply knew the special rules regarding the admissibility of bias/motivation to lie evidence.  Based on the record we have, we have no proof that his trial counsel even knew the special rules, which might explain why this evidence got ignored.  Without proof that trial counsel had some kind of intelligent discussion about the emails and their admissibility with Mr. Gaffney, we cannot assume, just based on a single question asked in a colloquy otherwise directed towards testifying in one's own defense, that Mr. Gaffney freely, intelligently, and voluntarily waived the emails or anything else when he said he did not want to present evidence in defense.

While the AEDPA standard is high, Mr. Gaffney would assert no reasonable jurist would find this a reasonable excuse to deny relief under Strickland.

Taken as a whole, the application of Strickland by the State court in this case

may just be one of those cases where "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103, 131 S.Ct. at 786-87, 178 L.Ed.2d 624. Here, a State court has claimed that Strickland permits a trial counsel to fail to introduce emails that clearly indicate bias and motivation to lie on the part of at least one key witness and perhaps up to three key witnesses. According to the State court, that is because 1) the emails can't be admitted as prior inconsistent statements; 2) there is no way to authenticate the emails; 3) the misspelling of K's name in an email casts authentication doubts on both emails; and 4) Mr. Gaffney should have introduced the emails in his case-in-defense. All of these reasons are either patently unreasonable or, in the case of (2) and (3) also involve the exercise of sheer speculation in both the actual (and future) admission of the emails and the results of any authentication process that might take place in the future. (Doc. 32 at Pg. 706-07).

In this case, it is difficult to fathom why trial counsel did not at least try to ask questions about bias and motivation to lie, and then introduce the emails if a satisfactory answer was not provided. (Although this technically was not required to introduce the emails.) Given the content of the emails, both AM/AR and M had some

33

explaining to do: AM/AR about her willingness to throw Mr. Gaffney under the bus; and M for why his own mother thought he was molesting his own half-sisters. AM/AR was a critical witness, as she essentially bolstered the credibility of K, whose credibility needed all the help it could get. M was the only person who positively identified Mr. Gaffney as being in the children's bedroom at the time of the incident; was the only person who testified that a strange stain was on the bedsheets; and was the only person who testified it was Mr. Gaffney who was uncharacteristically washing the sheets with the strange stain on it. (Doc. 32 at Pg. 332, 335, 336, 337).

In sum, not even trying to impeach at least AM/AR with the emails (and possibly M and K as well) constitutes the very deficient performance that Strickland is designed to remedy. The credibility of AM/AR, K, and M were all extremely important. K's credibility was suspect after her "I only lie when people want me to lie" comment. (Doc. 32 at Pg. 247). Even the judge threw out two molestation counts on a judgment of acquittal. (Doc. 32 at Pg. 500). The forensic and other evidence in the case was not significant and certainly could not have independently supported the jury verdict. If the jury thought AM/AR, K, or M or any of them were covering something up, it could have very well have affected the jury verdict.

Mr. Gaffney would assert that the speculation regarding the typographical error in K's name and whether the emails could ever be authenticated satisfactorily were

34

"unreasonable determination[s] of the facts in the light presented in the State court proceeding.  See 28 **U.S.C.** sec. 2254(d)(1)-(2); McKiver, 991 F.3d at 1364.  Indeed, these determinations were based upon no facts whatsoever.  What law the State court did apply to what little facts we have surrounding this issue were certainly not applied in an "objectively reasonable manner".  See 28 **U.S.C.** sec. 2254(d)(1)-(2); McKiver, 991 F.3d at 1364.

In all, while the AEDPA standard is high, it is not insurmountable.  Mr. Gaffney would assert that there does not exist a "reasonable argument that counsel satisfied Strickland's deferential standard".  Harrington, 562 U.S. at 105, 131 S.Ct. at 788, 178 L.Ed.2d 624.  No clever trial strategy involves hiding an email or line of inquiry about a key State witness who has gone on the record stating that she would lie on Mr. Gaffney to keep her family intact.  There would be no "opening the door" to bad facts or an adverse result to Mr. Gaffney if trial counsel asked AM/AR if she ever stated she would be willing to falsely implicate Mr. Gaffney if that is what it meant to keep her family intact.  Likewise, the jury would not look aghast at Mr. Gaffney's position if he ultimately had to introduce emails indicating AM/AR would falsely implicate Mr. Gaffney as the molester and that AM/AR had at least a suspicion that M was molesting his own half-sisters.  In other words, there was really no reason to keep such potentially damaging evidence about AM/AR (and possibly M) at bay

when the State was already struggling with witness credibility issues.

Likewise, the failure to even try to admit the emails severely undermines confidence in the trial and the verdict. With witness credibility already at issue for at least one of the witnesses, and perhaps all three, evidence that AM/AR was willing to lie on Mr. Gaffney to keep her family intact (and perhaps hide M's serial incest molesting), was something the jury absolutely needed to hear and consider. While it is admittedly a high standard, this may be one of those instances where trial counsel's incompetency rendered the trial fundamentally unfair or unreliable. See Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000).

In this case, the State court manifestly applied the Strickland standard in a wholesalely unreasonable manner. The District Court, by basically adopting the State court's findings as their own, committed the same errors as the State court.

In this vein, Musson v. State is instructive. 242 So. 3d 512 (Fla. 2d DCA 2018). In Musson, the Florida Second District Court of Appeal found appellate counsel ineffective for failing to argue the improper exclusion of bias testimony towards a battery charge when appellate counsel made the bias argument for the kidnaping charge and won. See id. at 515, 516, 517. The appellate court found that, because the bias testimony affected both the kidnaping and the battery charge, the appellate court would have also reversed on the battery charge had appellate counsel

36

made the same bias argument for the battery charge.  See id. at 517.  As a result, the appellate court found that confidence in the overall outcome of the appeal was undermined by what the appellate court found was essentially an unfathomable decision to only present the bias argument for the kidnaping charge.  See id. at 516, 517.

Here, not trying to impeach at least AM/AR with the emails for bias and motivation to lie is unfathomable.  When one of the emails comes straight out and announces, in all-caps shouty language:

> DON'T THINK FOR A MINUTE I WOULDNT [sic] LIE ON YOU TO
>
> KEEP MY CHILDREN.  ALWAYS KEEP THAT IN MIND.

(Doc. 32 at Pg. 145) (emphasis theirs).

one would think even the most dimwitted attorney would want to make something out of this in front of the jury.  This wasn't just ordinary Strickland error.  This was obvious Strickland error; an action that no reasonable counsel would have taken under the circumstances.  See Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000).  Further, this was not a case where the State courts and the District Court ruled incorrectly, but understandably so.  The State courts and the District Court overfocused on a prior inconsistent statement argument that wasn't there and forgot all about the bias/motivation to lie argument that was there in plain sight.  No

reasonable jurist should conclude that an opinion that completely misses the point is somehow reasonable, whether under AEDPA or just plain common sense.

As a result, this Court should grant a writ of habeas corpus, conditioned on the state court holding a new trial on the counts for which Mr. Gaffney was found guilty at trial. In the alternative, it may be possible to grant a writ of habeas corpus, conditioned on holding an evidentiary hearing on the emails in State court as a part of Mr. Gaffney's Rule 3.850 proceeding.

CONCLUSION

In a nutshell, both the State court and the District Court missed the point about the relevance and the significance of the two emails. Both courts thought the emails were penny-ante prior inconsistent statement evidence. However, the true relevance and significance of the two emails is as evidence of bias and motivation to lie–a powerful type of evidence like no other in the evidence code. With at least one key government witness experiencing serious credibility issues, the emails had a way of explaining why K couldn't keep her facts straight; why M suddenly paid such close attention to Mr. Gaffney's laundry habits; and why AM/AR testified that K told AM/AR it was Mr. Gaffney who did it despite AM/AR testifying that she had no reason to believe Mr. Gaffney was actually there on the night in question. (Doc. 32 at Pg. 311, 312, 313). The emails disclosed they all, in their own way, had reasons to throw Mr. Gaffney under the bus.

Once both the State court and the District Court missed such a crucial point, the analysis went downhill from there. As a result, both courts arrived at a patently unreasonable application of Strickland that warrants habeas relief at this time.

As a result, this Court should grant a writ of habeas corpus, conditioned on the state court holding a new trial on the counts for which Mr. Gaffney was found guilty at trial. In the alternative, it may be possible to grant a writ of habeas corpus,

conditioned on holding an evidentiary hearing on the emails in State court as a part of Mr. Gaffney's Rule 3.850 proceeding.

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify pursuant to Federal Rule of Appellate Procedure 32(a)(5), (a)(6), (a)(7)(A) and (a)(7)(B)(i) that the font used in this brief is Times New Roman, 14 point, and the word count is approximately 9,674 words.

<u>CERTIFICATE OF SERVICE</u>

I certify that, on September 21, 2023, a true copy hereof was furnished to: Allison Leigh Morris, Assistant Attorney General and counsel for the Appellee, through the CM/ECF system; and, on the same date, four paper copies hereof were furnished to this Court by US Mail.

<u>/s/ Christopher Desrochers</u>
Christopher Desrochers
Christopher A. Desrochers, P.L.
2504 Ave. G NW
Winter Haven, FL 33880
(863) 299-8309
Fla. Bar #0948977
Designated Email Address: cadlawfirm@hotmail.com
Appointed Counsel for Appellant, Gregory Gaffney.